**KUHNER et al. v. IRVING TRUST CO. \***
No. 406.

Circuit Court of Appeals, Second Circuit.
July 13, 1936.

\*Writ of certiorari granted 57 S. Ct. 109, 81 L. Ed. —.

Mitchell, Taylor, Capron & Marsh, of New York City (Rollin Broune, Ralph M. Arkush, and Henry L. Glenn, all of New York City, of counsel), for claimants.

Cravath, deGersdorff, Swaine & Wood, of New York City (William D. Whitney, of New York City, of counsel), for Trustee Irving Trust Co.

Edgar G. Crossman, of New York City, for debenture holders committee.

Sanford H. E. Freund, of New York City, for preferred stockholders' committee.

M. Carl Levine, of New York City, for Jacob Ruppert Realty Corporation, amicus curiæ.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

These appeals arise from a claim by lessors against a lessee, the debtor, in a reörganization proceeding under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The debtor had entered the locus in quo under a lease from the claimants by which it agreed that, if it should be adjudicated a bankrupt, they might re-enter and that it would then "indemnify the Landlords against all loss of rent which the Landlords may incur by reason of such termination during the residue of the term." The debtor was adjudicated in 1932, before section 77B was passed, and its trustee rejected the lease, after which the lessors re-entered. They have filed a claim for the difference between the rent reserved and the present value of the term; the judge allowed the claim, but limited it to three years' rent, in accordance with subdivision (b) (10) of section 77B, 11 U.S.C.A. § 207 (b) (10). A committee of debenture holders and a committee of preferred shareholders appeal, asserting that it should be expunged in toto; the lessors appeal because it has been limited as against shareholders; they concede that it should be subordinate to the claims of other creditors so far as it exceeds the limit.

The first question is as to the appeals of the two committees which go to the allowability of any part of the claim. The argument is that only the breach of the covenant to indemnify the lessors is provable, and that as to this, since the period of the term must expire before they can know what their loss is, or, indeed, whether they have suffered any, the damages must await the expiration of the period of the term; and that it cannot be liquidated now. Subdivision (b) (10) certainly makes the "rejection" of the lease a factor in recovery, though it does not say on what else the recovery shall be based, except that it shall be for the lessor's "injury." When first introduced into the House (H.R. 5884), the section did not expressly mention leases; the language merely was that any rejection of an executory contract should be a breach, and should result in a claim for damages unless the contract was ended by "re-entry," among other things.* However, that word showed that leases were included; and if the act had followed the original House bill, the committees would certainly be right in saying that the claim at bar could stand only on the covenant, if it could on that. It is very difficult to know what the section really means, as it finally did emerge. For instance, "rejection" by the lessee under the judge's direction is classed with "rejection" by a receiver or trustee, as though its legal effect were the same.

---

* "In case any executory contract shall be rejected, the same shall be deemed to have been breached and the holder shall be entitled to file a claim for damages for such breach and such claim may be allowed provided such contract shall not have been terminated by forfeiture, re-entry or otherwise." (11 U.S.C.A. § 207(b) (10).

Obviously it is not; rejection by a receiver or trustee merely ends the possibility that he may become an assignee of the term by operation of law; it does not create the lessee's default, though of course acceptance would relieve him in futuro. But, whatever was meant, we cannot suppose that Congress was trying to make over the contract by imposing a liability for future rent on the lessee after the term had ended. Indeed, we should have considerable doubt whether the bankruptcy power would support such an effort. At least the original bill attempted nothing of the sort, and a change of language so inartificial and obscure ought not, it seems to us, be given so extravagant an effect. It is not necessary to read it so; it is enough if the language be taken to mean that the "rejection" of a lease shall be a present breach of all the lessee's promises, either to pay rent, to rebuild, to cover taxes or whatever else they may be. Indeed, if it continues his liability after re-entry, it was redundant to include covenants "for damages or indemnity." We do not therefore believe that this language creates new claims after re-entry, and the committees, so far, are right. We have in substance already so declared, and we adhere to what we said. In re United Cigar Stores Co. (Ex parte Otis Land Estate Co.) (C.C.A.) 83 F.(2d) 202, 206.

But in the result the committees are wrong. At petition filed the lessee was under an absolute liability to indemnify the lessors, though in an unknown amount; and indeed it was not even certain that there would be any recovery at all. That the payment was to be made in the future was not indeed material, but the ad damnum was so uncertain that before the reörganization act the claim could not have been proved. Manhattan Properties v. Irving Trust Co., 291 U.S. 320, 54 S.Ct. 385, 78 L.Ed. 824. The question is how far that act has changed the law. Again the language is obscure, but now the purpose is apparent; it was at least to give lessors some immediate relief which had been impossible in bankruptcy. This is obvious in section 63a (7), as amended in 1934, 11 U.S.C.A. § 103 (a) (7), and the language there is like that of section 77B (b) (10), 11 U.S.C.A. § 207 (b) (10). A present and definite claim "for damages and indemnity" was to be provable, and its amount could be computed only in case a present appraisal of the future value of the term was accepted as one factor in

the equation. Otherwise the statute accomplished nothing. We hold therefore that the claim is to be liquidated like a claim for breach of an executory contract for chattels; that is, by discounting the future payments and subtracting the appraised value of the term from their sum.

There remains the question of limitation; first, whether the statute meant to limit such claims except as against other creditors; second, whether it was constitutional, if it did. As we have already shown, the House bill ranked such claims generally on a parity with other debts. The Senate at first let this stand as to lessors in reörganizations, but limited it in bankruptcy to one year. Later it changed its position as to reörganizations by subordinating the claim to other debts so far as it exceeded one year's rent. In conference the present form was adopted; the words, "ranking on a parity," etc., then becoming unnecessary, strictly speaking. The construction suggested by the lessors might indeed have been a compromise between the position of the two houses, but if it was, it is impossible to imagine why it should have been put in the words chosen. The Senate had just shown that it knew how to say that the lessor should have an unlimited subordinate claim; the substitute expressly declared that the claim should in general be on a parity, but that it should be limited. How this can be wrenched into saying that in addition it should be allowed against shareholders without limit we cannot understand; it is more reasonable to assume that the clause was merely vestigial. We have no doubt that such claims are provable only so far as they share in "parity."

The supposed unconstitutionality of the act, so read, depends upon the fact that lessors' claims, though calculated in customary ways, are not only denied equal standing with other debts, which would indeed be permissible, but are not allowed against shareholders. This was bad enough, the argument runs, when the debt was not discharged, but now even that remedy is taken away, and in its stead an inadequate and truncated substitute is provided. This position presupposes that the appraisal of the future value of real estate is so reliable a basis for the distribution of a fund in court, that Congress was obliged to treat it as good against shareholders. No doubt the present tendency is to accept more speculative evidence of damages than formerly, rather than turn away a promisee

empty-handed; but there are still limits, and indeed there always must be, if human affairs are not to be subject to the fancies of any dreamer who has the hardihood to take an oath. The appraisal of realty at a distant time is the merest guess; nobody can possibly know anything about it, and one man's guess is nearly as good as another's. For this reason Congress might circumscribe its use to the near future, not only as against creditors, but against the lessee itself. That would be no more drastic or unfair than the common law had been again and again. The lessors reply that this might be well enough, if Congress had really acted on that theory, but it did not. Such a principle would require the limit to be reckoned in future losses, not in rents; as for example, by saying that the difference between the rents and the appraised future value should be allowed for only five years. Three years' gross rents have no relation whatever to three or five years' losses, for example, the term might have a value equal to three-quarters of the rents; if it did, the lessor could prove twelve years' losses; and a present forecast over that whole period would be treated as reliable evidence. If on the other hand the value of the term was only one-fourth of the rents, the lessor could recover only four years' losses; and any further forecast would be considered too conjectural. The limit actually fixed cannot therefore be defended on the supposed principle; and the statute is mere caprice.

 The mere fact that the test is a rude one will not, however, invalidate the act if it has some rational relation to the end to be achieved; courts do not sit to enforce counsels of perfection upon legislatures. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160; Second Employers' Liability Cases, 223 U.S. 1, 52, 53, 32 S.Ct. 169, 56 L.Ed. 327, 38 L.R.A.(N.S.) 44; Chicago Dock Co. v. Fraley, 228 U.S. 680, 687, 33 S.Ct. 715, 57 L.Ed. 1022. The limit chosen has such a rational relation. It is indeed true theoretically that there may be cases where a lessor's losses would be recoverable for only three years, the value of the term having fallen to nothing; but those would be extreme cases and rare; ordinarily the term will have a substantial residual value and the lessor's losses will be recoverable for four or five years at least. That is a period which Congress might well fix as the maximum forecast which it would be safe to act on. There

will, however, be many cases where recoverable losses will go far beyond that period, and that makes the discrimination. Primarily it is the lessee who should complain of that; he may well argue that if appraisals of the future become too conjectural at four or five years they ought not to be allowed for ten, fifteen or twenty. There are two answers to this: First, it is an objection good only in the lessee's mouth; and, second, it is not good in his. It is abundantly settled that to challenge a statute one must suffer a personal grievance; vicarious complaints will not serve. Plymouth Coal Co. v. Pennsylvania, 232 U.S. 531, 544, 545, 34 S.Ct. 359, 58 L.Ed. 713; Jeffrey Mfg. Co. v. Blagg, 235 U.S. 571, 576, 35 S.Ct. 167, 59 L.Ed. 364; Arizona Employers' Liability Cases, 250 U.S. 400, 429, 39 S.Ct. 553, 63 L.Ed. 1058, 6 A.L.R. 1537; Oliver Iron Co. v. Lord, 262 U.S. 172, 180, 181, 43 S.Ct. 526, 67 L.Ed. 929; Gorieb v. Fox, 274 U.S. 603, 606, 47 S.Ct. 675, 71 L.Ed. 1228, 53 A.L.R. 1210. Moreover, a lessee could not complain; he is getting a discharge upon a payment which he cannot show is too great until the occasion is past. Therefore, the lessor's only grievance comes to this, that when his losses are large he is not treated equally with those whose losses are small. If, as we think, no lessor is unjustly treated as against his lessee, this is a complaint to which we are not disposed to lend an auspicious ear. No doubt inequality without basis is favoritism, and favoritism arouses resentment among just persons, even when the unpreferred would have no complaint, if they stood alone. But all inequalities are not of equal moment and here there is an attempt at equality by giving all members of the class a share in the pot, measured by a uniform rule. The Fifth and Fourteenth Amendments are not manuals or vade mecums; they stand rather for attitudes of the will than for commands to conduct. Certainly in cases like this where the law is not an effort to compose conflicting group interests—though possibly in those cases too—perhaps the best way to apply their precepts is to ask whether they shock one's native and unsophisticated sense of fair play. Nor is that irrational either, for a legislature is justified in embodying that sense into law; it is not obliged to, and usually it cannot, adjust all interests with ideal nicety; nor is it bound to the best contrivances, as we have just said. Nobody should be shocked that in a class of

claims like these, so inherently uncertain, a piepowder standard is chosen, even though it operates unevenly, as unquestionably it does.

There remains only the fact that the debtor is discharged. A petition under section 77B, whether voluntary or involuntary, must allege that the debtor is insolvent, or that it cannot pay its debts as they mature. Shareholders are entitled to protection as of right only "for the realization by them of the value of their equity, if any." Subdivision (b) (4), section 77B, 11 U.S.C.A. § 207 (b) (4). If they get an interest in the reorganized insolvent, it must be because it is desirable to continue the business under the old management, or because they will be induced to subscribe new money, or for some other reason of the sort. If, therefore, a corporation is insolvent and there is no equity, the right to pursue the lessee is a phantom which Congress did right to ignore. It is true that corporations which cannot pay their maturing debts may have a real equity, and a discharge against them may be a substantial detriment to the creditor. But before holding that the substitute was here inadequate we must look at the position in which these lessors would have found themselves if there had been no reörganization. The corporation being in default would by hypothesis be open to dismemberment by its creditors; in that scramble the lessors would not share, for they would have no present claim. Only as their rents fell due, could they collect; unless indeed the covenant must be read as that in Hermitage Co. v. Levine, 248 N.Y. 333, 162 N. E. 97, 59 A.L.R. 1015, in which event they would have had to wait till the end of the whole period. Such remedies against a debtor are no better than if it were out and out insolvent. This reasoning does not apply when there is a fixed sum unconditionally due before petition, and possibly the limit does not then apply either. We assume that it does apply, when the lease has a covenant allowing the lessor to charge the lessee after re-entry in a single sum with the difference between the accelerated rents and the present value of the term, and he re-enters after petition filed. In that situation our reasoning just above does not perhaps carry as persuasively, and we may leave the question open whether the limit is then valid. As to this lease it certainly is, and that is true whether we construe the covenant as requiring

successive indemnities, or a single one at the end of the whole period.

Order affirmed.

