T.C. Memo. 2000-128


UNITED STATES TAX COURT


MICHAEL VETRANO AND PATRICIA VETRANO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8996-97.          Filed April 10, 2000.


<u>John R. Crayton</u>, for petitioners.

<u>Keith L. Gorman</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following deficiencies in, and penalties with respect to, Mr. Michael Vetrano's Federal income tax for 1991 and 1992:

| Year | Deficiency | Fraud Penalty |
|------|-----------|---------------|
| 1991 | $10,488 | $7,866 |
| 1992 | 10,600 | 7,950 |

Respondent also determined the following deficiency and penalty with respect to petitioners' Federal income tax for 1993:

| Year | Deficiency | Fraud Penalty |
|------|-----------|---------------|
| 1993 | $32,114 | $24,086 |

The issues for decision are: (1) Whether Mr. Vetrano (referred to herein as petitioner) earned unreported net income in 1991, 1992, and 1993 from his business of dealing in used automobile parts; (2) whether petitioner is subject to self-employment tax with respect to the unreported income from his automobile parts business; (3) whether returns at issue are subject to the fraud penalty under section 6663 and, if so, whether some part of the underpayment for 1993 is due to the fraud of Mrs. Patricia Vetrano; and (4) whether Mrs. Patricia Vetrano is eligible for relief as an innocent spouse under section 6015 or former section 6013. Unless stated otherwise, all section references in this opinion are to the Internal Revenue Code as in effect during the years in issue.

FINDINGS OF FACT

Petitioners are husband and wife. They filed separate returns for 1991 and 1992 and a joint return for 1993. Mrs. Vetrano's separate returns for 1991 and 1992 are not

at issue in this proceeding.  At the time they filed the instant petition, petitioners resided in Sicklerville, New Jersey.

Petitioner is a bricklayer.  His returns for 1986 and 1987 report wages of $15,119 and $10,123, respectively, that appear to be from employment as a bricklayer.  Circa 1984, he entered into the business of dealing in used automobile parts.  Petitioner's 1986 and 1987 income tax returns include Schedules C, Profit or (Loss) From Business Or Profession, that report income and deductions from an automobile parts sales business operating under the name B & D Auto Parts.  The Schedules C report the following income and deductions:

| B & D Auto Parts | 1986 | 1987 |
|---|---|---|
| Gross receipts or sales | $103,329 | $109,029 |
| Cost of goods sold | -91,429 | -96,453 |
| Gross profit | 11,900 | 12,576 |
| Deductions | | |
| Car and truck expenses | 3,315 | 3,540 |
| Office expense | 22 | 25 |
| Utilities and telephone | 297 | 289 |
| Total deductions | 3,634 | 3,854 |
| Net profit or (loss) | 8,266 | 8,722 |

Petitioners' returns for 1986 and 1987 were prepared by a public accountant, Mr. Dennis F. Judge.

During the years in issue, 1991 through 1993, petitioner received payroll checks from BMAP CORP, also known as Bill Murray Auto Parts (referred to herein in as BMAP) and another business, Anastasi Brothers Corp., that are reflected on Forms W-2, Wage and Tax Statements, issued to petitioner.  The Forms W-2 report wages in the following amounts:

|                        | 1991       | 1992     | 1993     |
|------------------------|------------|----------|----------|
| BMAP                   | $2,744.00  | $14,560  | $14,000  |
| Anastasi Bros. Corp.   | 5,860.80   | -0-      | -0-      |
|                        | 8,604.80   | 14,560   | 14,000   |

The above amounts are reported on Mr. Vetrano's separate returns for 1991 and 1992 and petitioners' joint return for 1993.

During the years in issue, petitioner's income was derived principally from his automobile parts business. He did little or no work as a bricklayer.  Petitioner received the following nonpayroll payments from BMAP and four other entities:

|                        | 1991     | 1992     | 1993      | Total     |
|------------------------|----------|----------|-----------|-----------|
| BMAP                   |          |          |           |           |
| Cash                   | $73,713  | $30,319  | $16,981   | $121,013  |
| Checks, Nonpayroll     | 21,097   | 64,824   | 230,322   | 316,243   |
| Subtotal               | 94,810   | 95,143   | 247,303   | 437,256   |
|                        |          |          |           |           |
| Sing-Sing              | 90       | -0-      | -0-       | 90        |
| Gerre Trans            | 280      | 470      | -0-       | 750       |
| Richman & Sons         | 525      | -0-      | -0-       | 525       |
| Camden City Probation  | -0-      | -0-      | 1,035     | 1,035     |
| Total                  | 95,705   | 95,613   | 248,338   | 439,656   |

The above payments are not reported on petitioner's separate returns for 1991 and 1992 or petitioners' joint return for 1993.  Petitioner maintained no books and records for his automobile parts business.

BMAP supplies automobile parts to remanufacturers and rebuilders on a wholesale basis.  It does not sell automobile parts to the general public.  During the years in issue, BMAP published one or more price lists of the automobile parts that it would purchase and the amount that it would pay for each automobile part on the list. Petitioner obtained automobile parts listed on BMAP's price list principally from junk yards and delivered them to BMAP.  BMAP paid petitioner the amount set forth on its price list for each of the automobile parts that it received from petitioner.  BMAP did not require petitioner to produce receipts for the automobile parts that he sold to BMAP or to establish his cost in any way.  After petitioner received a payment from BMAP, either in cash or

by check, petitioner was not obligated to account to BMAP for the money, and there was no restriction or limitation on petitioner's use of the money.  He was free to use the money received from BMAP in any way he wished.

Petitioner married Mrs. Patricia Vetrano in 1991. During 1993, she was employed at a racetrack in Atlantic City, New Jersey.  She received a Form W-2 from the Atlantic City Racing Association for 1993 that reports wages of $17,561.75.  This amount was reported on petitioners' joint return for 1993.

Petitioner was previously married to Ms. Teresa A. Simone.  He had two children from that marriage.  He was divorced from Ms. Simone pursuant to a divorce action that was commenced in 1987 in the New Jersey Superior Court, Family Part, Chancery Division.  By order dated May 3, 1988, the divorce court ordered him to pay $200 per week to Ms. Simone as child support for his two children.  For several years thereafter, including during the years in issue, petitioner and Ms. Simone engaged in litigation over the amount of child support that petitioner would have to pay and various other matters.  From time to time in that litigation, petitioner was required to document his income by submitting pay stubs and other financial information, including bank statements, to the divorce court.

On or about May 29, and November 11, 1992, Mr. Vetrano filed case information statements with the divorce court. Both statements include the following "income information":

|  | 1. Last Year's Income | Yours |
|---|---|---|
| 1. | Gross earned income in calendar year (1991) | $8,605 |
| 2. | Unearned income (same year) | 2,995 |
| 3. | Total Income Taxes paid on above income (inc. Fed., State, F.I.C.A. and S.U.I). | 2,023 |
| 4. | Net Income | 9,577 |

Petitioner's return for 1991 reports wages of $8,605, taxable interest of $112, a State tax refund of $46, and unemployment compensation of $2,837.  As to petitioner's income for 1992, the case information statements submitted to the divorce court suggest that petitioner was receiving gross wages from BMAP of $280 per week.

During the years in issue, petitioner and his wife deposited only a few of the checks that petitioner received from BMAP.  The following schedule shows the total number of checks that petitioner received from BMAP, the aggregate dollar amount of those checks, the aggregate dollar amount of the checks that were cashed, and the aggregate dollar amount deposited into an account maintained by either one of them:

| Year | No. of Checks | Total Received | Amount Cashed | Amount Deposited |
|------|---------------|----------------|---------------|------------------|
| 1991 | 18 | $21,097 | $18,955 | $2,142 |
| 1992 | 53 | 64,824 | 58,847 | 5,977 |
| 1993 | 168 | 230,322 | 224,830 | 5,492 |

During the years in issue, Mrs. Vetrano knew that petitioner's income was derived principally from his automobile parts business. She was also aware of the payments that he received from BMAP. She played a role in negotiating the checks that petitioner received from BMAP. During 1991 and 1993, she signed or countersigned checks in the aggregate amounts of $7,650 and $52,157, respectively. During 1993, she also cashed 34 checks in the aggregate dollar amount of $48,203 at the race track where she was employed. Finally, during 1993, she signed a check in the amount of $2,603 and deposited it into a bank account that she maintained at Mid Atlantic Bank.

Mrs. Vetrano handled the couple's household finances. She made deposits into the separate checking accounts maintained by herself and her husband, and she signed checks drawn on both accounts to pay household expenses. The deposits that she made into the couple's separate checking accounts consisted mostly of cash and were in amounts that approximated the couple's monthly bills. She obtained the cash for her monthly deposits by cashing her own payroll checks and by asking petitioner for cash.

On March 30, 1990, Mrs. Vetrano and petitioner executed a residential loan application to the Meridian Mortgage Corp. for a mortgage loan in the principal amount of $88,900 to purchase a home as joint tenants. The application states that petitioner's "base empl. income" was $4,583 per month. The application also states that the couple had liquid assets, principally two bank accounts, of $53,918 and owned two other real properties with an aggregate market value of $205,000. A second residential loan application that Mrs. Vetrano and petitioner executed on December 15, 1990, provides similar information.

Apparently, the mortgage loan was approved, and petitioners purchased the property. One of the two other real properties listed on the loan application was sold on or about April 29, 1992, and the proceeds were divided between Mr. Vetrano and his former spouse. The record does not disclose what happened to the other real property listed on the loan application.

In August 1993, petitioners sought to refinance the above mortgage loan. In that connection, a credit agency, Credit Lenders Service Agency, Inc., asked petitioners to explain certain information regarding Mr. Vetrano's payment of child support that appeared on a derogatory credit history. Mrs. Vetrano corresponded with a representative

of Credit Lenders Service Agency, Inc., regarding the matter and explained:

> My husband (at that time) was in the process of having his support order reduced. His lawyer was holding an escrow account of $3,000 for his support. Support was reduced from $130 to $75 per week. This money is paid weekly thru his employer - paid directly to Camden County Probation Dept and to date he is paid as stated by new court order.
>
> Patricia A. Vetrano
> 8-31-93

She also sent a copy of Mr. Vetrano's divorce decree to the credit agency.

As mentioned above, the returns at issue do not report the payments that petitioner received from BMAP and four other entities in the aggregate amounts of $95,705, $95,613, and $248,338, composed primarily of the nonpayroll checks and cash issued to petitioner by BMAP for the sale of automobile parts. Each of the returns lists petitioner's occupation as "brick layer". None of the returns states that petitioner was engaged in the automobile parts business.

The subject returns were prepared for petitioners by Mr. Dennis Judge, who had also prepared petitioners' 1986 and 1987 returns. As mentioned above, petitioner's 1986 and 1987 returns included Schedules C for his automobile

parts business operating under the name B & D Auto Parts. Mr. Judge did not know that petitioner had engaged in the automobile parts business during the years in issue, nor did he know of the unreported income earned by petitioner from that business until the subject returns were audited.

When respondent's agent asked Mr. Judge about the checks that petitioner had received from BMAP, Mr. Judge said that he would obtain an explanation of those items from his client. Subsequently, he advised the agent that the checks were "cash advances". Shortly after that, Mr. Judge withdrew his representation of petitioners, and another individual, Mr. Kenneth Federman, undertook petitioners' representation. Initially, Mr. Federman asserted that the checks had been issued to petitioner in the course of his automobile parts business and the net profit of the business was reflected in the Forms W-2 issued to petitioner by BMAP. Later, Mr. Federman withdrew that assertion, and petitioners offered no other explanation of the cash and checks paid to petitioner by BMAP.

During the audit, Mr. Federman provided respondent's agent with a list that he said was a list of 100 vendors from whom petitioner purchased the used automobile parts. Respondent's agent contacted each of the vendors by a

letter requesting confirmation of the vendor's transactions with petitioner. The agent received 60 responses from the vendors, each of which stated that the vendor did not have any knowledge of Michael Vetrano.

Respondent's agent treated the unreported income summarized above as gross income from petitioner's automobile parts business. In the absence of any records regarding petitioner's cost of goods, respondent's agent allowed petitioner a cost of goods equal to 58.3 percent of gross receipts. This amount is based upon industry standards for a used automobile parts business. Respondent's agent also allowed certain other expenses that petitioner substantiated during the audit and applied the self-employment tax to the net income from the business. The adjustments and the self-employment tax determined in the subject notices of deficiency are as follows:

| Adjustments to Income | 1991 | 1992 | 1993 |
|---|---|---|---|
| Used auto parts gross receipts | $95,705 | $95,613 | $248,338 |
| Used auto parts cost of sales | -55,796 | -55,742 | -144,781 |
| Used auto parts other expenses | -10,671 | -9,294 | -7,382 |
| Self-employment tax deduction | -2,066 | -1,892 | -3,991 |
| Total adjustments | 27,172 | 28,685 | 92,184 |
| Self-employment tax | 4,131 | 3,783 | 7,982 |

After the respondent's agent began auditing petitioners, Mr. Vetrano transferred title to the couple's

marital residence, a 1994 Cadillac, and a 1989 Ford truck from joint ownership to Mrs. Vetrano.

## OPINION

Petitioners advance two positions in their posttrial brief. First they contend that "Mr. Vetrano had no unreported income from BMAP". Second, they contend that Mrs. Vetrano is eligible for relief as a so-called innocent spouse under former section 6013(e) or section 6015. The issues that we decide in this opinion involve petitioners' contention that "Mr. Vetrano had no unreported income from BMAP".

Two preliminary observations are appropriate. First, in their posttrial brief petitioners do not contend that the period of limitations on assessments under section 6501(a) expired before respondent issued either of the notices of deficiency. The petition asserts that the period of limitations on assessments under section 6501(a) had expired with respect to petitioner's separate 1991 and 1992 returns before the notice of deficiency was issued. Petitioners did not address this issue in their posttrial brief, and, thus, we consider it waived or abandoned. See Bradley v. Commissioner, 100 T.C. 367, 370 (1993) ("Petitioner has not pursued this line of objection on brief, and we consider it abandoned."); Stringer v.

<u>Commissioner</u>, 84 T.C. 693, 706 (1985) ("On numerous occasions, we in essence have defaulted or dismissed issues for failure to brief them. Generally, we have accomplished this result by considering the issue waived or conceded."), affd. without published opinion 789 F.2d 917 (4th Cir. 1986); <u>Lime Cola Co. v. Commissioner</u>, 22 T.C. 593, 606 (1954) ("Petitioners in their brief do not argue anything about transferee liability; and, although they do not expressly abandon the issue of transferee liability, we presume they no longer press it."); <u>Stonegate of Blacksburg, Inc. v. Commissioner</u>, T.C. Memo. 1974-213 ("Since petitioner did not consider this issue in either its original or reply briefs, we consider it to have been conceded.").

Second, petitioners' entire argument concerning the unreported income issue is directed toward the payments that petitioner received from BMAP. Petitioners raise no defense concerning the payments that petitioner received from the four other entities, Sing-Sing, Gerre Trans, Richman & Sons, and Camden City Probation, that are identified in the notices of deficiency. Accordingly, we hereby sustain respondent's determination as to the payments received from those entities.

As to petitioners' position that "Mr. Vetrano had no unreported income from BMAP", petitioners make three assertions. First, they acknowledge that Mr. Vetrano received payments from BMAP in the amounts determined by respondent, but they assert that "these payments were not income to him but advances made by his employer to purchase used auto parts on behalf of his employer." They also suggest that Mr. Vetrano received the payments "as agent for BMAP". According to petitioners:

> An employee who is given cash by his employer to purchase auto parts for his employer does not receive income when he is given that cash. While Mr. Vetrano could be adjudged stupid for cashing checks made out to him in order to secure the currency needed to buy auto parts for BMAP, the evidence does not establish that these disbursements were income to him. In fact, the evidence establishes that these were non-income disbursements made by BMAP to one of there [sic] employees.

Second, petitioners assert that Mr. Vetrano simply took the funds provided by BMAP and used them to purchase the automobile parts supplied to BMAP. They assert: "It is clear that Mr. Vetrano was a paid employee of BMAP and purchasing parts for BMAP at a cost reflected as a purchase expense on the books of BMAP." As we understand it, petitioners are asserting that the amount that Mr. Vetrano paid for each of the automobile parts supplied to BMAP and

the amount received from BMAP for each such part are the same.

Third, petitioners assert that respondent failed to offer a "rational basis for the deficiency" and that the notices of deficiency are therefore "arbitrary and unreasonable" and, thus, lack a presumption of correctness. As authority for this assertion, petitioners cite Portillo v. Commissioner, 932 F.2d 1128 (5th Cir. 1991), and Jackson v. Commissioner, 73 T.C. 394 (1979).

Addressing the last point first, we reject petitioners' assertion that the subject notices of deficiency are "arbitrary and unreasonable" and lack a presumption of correctness because respondent failed "to offer a rational basis for the deficiency". Generally, a taxpayer bears the burden of proving that the Commissioner's determination of a deficiency is erroneous. See Rule 142(a). All Rule references are to the Tax Court Rules of Practice and Procedure.

The cases cited by petitioners involve notices of deficiency in which the Commissioner had determined that the taxpayers had realized unreported income. See Portillo v. Commissioner, supra at 1131; Jackson v. Commissioner, supra at 397. In the first case, the court found the notice arbitrary and excessive because the Commissioner had

introduced no evidentiary foundation linking the taxpayer to the unreported income.  See Portillo v. Commissioner, supra at 1134.  In the second case, the Court found the notice arbitrary and excessive because the Commissioner's own evidence convinced the Court that the Commissioner's determination was arbitrary.  See Jackson v. Commissioner, supra at 403-404.

This is not such a case.  In this case, the testimony of the principal of BMAP, Mr. Gartland, proves that BMAP paid the subject amounts to petitioner, and petitioners have acknowledged in their posttrial brief that Mr. Vetrano engaged in the automobile parts business and received the payments from BMAP.  Thus, in this case, there is ample evidence linking the subject payments to petitioners.

In their first assertion, petitioners seem to be arguing that Mr. Vetrano functioned as a conduit through which his employer, BMAP, acquired automobile parts from various junk dealers during the years in issue, with the result that the payments he received from BMAP are not taxable income to him.  Petitioners do not clearly explain the legal basis for this position, and they cite no cases in support thereof.

We would agree that a taxpayer need not treat as income moneys which he did not receive under a claim of

right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit. See Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974); see also Stevens Bros. & Miller-Hutchinson Co. v. Commissioner, 24 T.C. 953, 957 (1955); Mill v. Commissioner, 5 T.C. 691, 694 (1945); Parker v. Commissioner, T.C. Memo. 1985-263. On the other hand, if a taxpayer receives moneys under a claim of right and without restriction or limitation as to the disposition of the moneys, then the taxpayer has received taxable income, even though it may still be claimed that he is not entitled to retain the money, and even though he may be liable to restore its equivalent. See North Am. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932).

Our problem with petitioners' conduit argument is that the facts do not support it. Neither petitioner's nor Mr. Gartland's testimony establishes a restriction or limitation on petitioner's use of the money received from BMAP. There was no requirement that petitioner account to BMAP or any other person for the funds paid by BMAP, and we find no agreement between petitioner and BMAP restricting petitioner's use of the funds to purchase automobile parts for delivery to BMAP. Neither the testimony of petitioner nor that of Mr. Gartland establishes that petitioner

received the subject payments as a conduit.  Based upon all of the facts and circumstances of this case, we find that petitioners received the subject payments from BMAP under a claim of right with no restriction or limitation on their use of the funds.

Our conclusion that the subject payments constitute taxable income to petitioner is not based upon his status as an employee of BMAP or as an independent contractor. The subject payments are taxable income to Mr. Vetrano regardless of whether his status is that of an employee or that of an independent contractor.  This is so because, in either event, he received the funds without restriction or limitation as to their disposition.

Petitioner's second assertion is that he paid junk dealers the amount specified on BMAP's price list for the automobile parts supplied to BMAP.  According to petitioner's testimony, he did not attempt to buy any parts for less than the amount specified on BMAP's price list.  Petitioner testified as follows:

> Q.   Well, I'm saying is you would try to get the
>      parts as cheaply as you could, correct?
>
> A.   You have price lists from BMAP that you went
>      and I went and had to pay for that.  I went
>      and paid for that price.  Whatever he had on
>      that list, I paid for the price because I
>      worked for him.  He wanted me to get as much
>      material as possible, so what I did, I went

out and I went by that list.  Whatever that
list said, I went and got.  I didn't try to
get it cheaper.  I had to be responsible for
BMAP.  BMAP was my responsibility.  He was
paying me to go get the parts, so I went
through the price list, and I paid what was
on that list.

We cannot accept the assertion that petitioner paid
the amount set forth in BMAP's price list for every
automobile part he supplied to BMAP during the years in
issue.  Petitioners introduced no books and records for
Mr. Vetrano's automobile parts business, and nothing in the
record corroborates petitioner's testimony.  We find
petitioner's testimony incredible and not worthy of belief.
In this connection, we note that even the Schedules C filed
with petitioner's own tax returns for 1986 and 1987 show a
profit margin of approximately 11.5 percent.  Accordingly,
we sustain respondent's determination that petitioner
received unreported income from BMAP.

Employee Versus Independent Contractor

As mentioned above, it is unnecessary to determine
whether petitioner was an employee or an independent
contractor in order to resolve the issue of whether
Mr. Vetrano realized unreported income during the years
at issue.  However, it is necessary to decide that issue
in order to redetermine whether petitioners are liable

for self-employment tax.  This is a factual question.
See Professional & Executive Leasing, Inc. v. Commissioner,
89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir.
1988); Packard v. Commissioner, 63 T.C. 621 (1975).

Petitioners rely upon the vague and self-serving
testimony of Mr. Vetrano and Mr. Gartland and on the fact
that BMAP issued payroll checks and Forms W-2 to
Mr. Vetrano.  In their testimony at trial, petitioner and
Mr. Gartland simply label petitioner as an employee.  There
is nothing in their testimony or in the record of this case
to show that, with respect to his earning of the unreported
income, Mr. Vetrano was an employee of BMAP under the usual
common-law rules applicable in determining the employee-
employer relationship.  See, e.g., Rev. Rul. 87-41, 1987-1,
C.B. 296.  For example, there is no evidence that BMAP,
Mr. Gartland, or any other person had the right to control
petitioner's activities in any fashion.  There is no
evidence that petitioner was obligated to devote any of his
time to BMAP.  BMAP supplied no equipment, training, office
space, or expense reimbursements to petitioner.  Indeed,
neither petitioner nor Mr. Gartland was able to explain how
petitioner's alleged salary payments were computed.
Accordingly, we conclude that petitioner was an independent
contractor subject to self-employment tax.

Fraud Penalty

Respondent determined that petitioner fraudulently omitted income from his individual 1991 and 1992 returns on which there are underpayments of $10,488, and $10,600, respectively.  Respondent determined that the entire underpayment for each of the years 1991 and 1992 is attributable to fraud.  Therefore, respondent determined that petitioner is liable for civil fraud penalties under section 6663 of $7,866 and $7,950, respectively.

Respondent also determined that petitioners fraudulently omitted income from their joint 1993 return on which there is an underpayment of $32,114.  As to 1993, respondent also determined that the entire underpayment is attributable to fraud and that some part of the underpayment is due to the fraud of both petitioners. Therefore, respondent determined that petitioners are both liable for a civil fraud penalty under section 6663 of $24,086 for 1993.

Section 6663(a) provides that, if any part of an underpayment is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.  The Commissioner bears the burden of proving by clear and convincing evidence:  (1) An underpayment exists; and (2)

some portion of the underpayment is attributable to fraud. See sec. 7454(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992). The term "underpayment" is defined in section 6664(a) as "the amount by which any tax imposed by this title exceeds the excess of (1) the sum of (A) the amount shown as the tax by the taxpayer on his return, plus (B) amounts not so shown previously assessed (or collected without assessment), over (2) the amount of rebates made." The Commissioner must establish fraud with respect to the taxpayer's return for each taxable year. See Otsuki v. Commissioner, 53 T.C. 96, 105 (1969); AJF Transp. Consultants, Inc. v. Commissioner, T.C. Memo. 1999-16.

If the Commissioner establishes that any portion of the underpayment is attributable to fraud, then the entire underpayment is treated as attributable to fraud, unless the taxpayer establishes by a preponderance of evidence that it is not attributable to fraud. See sec. 6663(b). In the case of a joint return, the fraud penalty shall not apply to a spouse unless some part of the underpayment is due to the fraud of that spouse. See sec. 6663(c).

To prove fraudulent intent, the Commissioner must show that the taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or

otherwise prevent the collection of such tax.  See
Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Rowlee
v. Commissioner, 80 T.C. 1111, 1123 (1983).  The existence
of fraud is a question of fact to be resolved upon
consideration of the entire record.  See DiLeo v.
Commissioner, supra at 874; Gajewski v. Commissioner, 67
T.C. 181, 199 (1976), affd. without published opinion 578
F.2d 1383 (8th Cir. 1978).  Fraud will never be imputed or
presumed but must be affirmatively established by clear and
convincing evidence.  See Beaver v. Commissioner, 55 T.C.
85, 92 (1970).

Because direct proof of a taxpayer's fraudulent intent
is rarely available, fraud may be shown by circumstantial
evidence.  See Stephenson v. Commissioner, 79 T.C. 995,
1005-1006 (1982), affd. per curiam 748 F.2d 331 (6th Cir.
1984).  A taxpayer's entire course of conduct may establish
the requisite fraudulent intent.  See Stone v. Commis-
sioner, 56 T.C. 213, 224 (1971); Otsuki v. Commissioner,
supra at 105-106.

Over the years, courts have developed a nonexclusive
list of factors that demonstrate fraudulent intent.  These
badges of fraud include:  (1) Understating income, see
Holland v. United States, 348 U.S. 121, 137 (1954); Parks
v. Commissioner, 94 T.C. 654, 664 (1990); (2) inadequate

books and records, see <u>Merritt v. Commissioner</u>, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; (3) false entries on or alterations of documents, see <u>Spies v. United States</u>, 317 U.S. 492, 499 (1943); (4) failure to file tax returns, see <u>id.</u>; (5) implausible or inconsistent explanations of behavior, see <u>Grosshandler v. Commissioner</u>, 75 T.C. 1, 20 (1980); (6) concealment of income or assets, see <u>Bradford v. Commissioner</u>, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; (7) dealing in cash; and (8) failure to cooperate with tax authorities, see <u>id.</u> at 307-308.

Respondent argues that Mr. Vetrano's conduct exhibit the following badges of fraud:

> Vetrano engaged in a 3-year pattern of under-stating income. He took steps to cover up the source of his income. He dealt in cash to avoid scrutiny of his finances. He structured his affairs to avoid making records the effect of which was to mislead or conceal. He failed to keep adequate and accurate records. Not only did Vetrano fail to cooperate with tax authorities in computing his correct income, he deliberately misled the examining agent by having his representative supply a false list of suppliers to him. He willingly defrauded others and was dishonest in business and personal transactions, particularly with respect to statements made in the New Jersey court which was adjudicating his divorce from Teresa Vetrano. He possessed sufficient education and knowledge of his duty to report income. He provided implausible and false explanations, such as that he was not in the auto parts business but was a bricklayer, when he admittedly had earned no income from 1991 through

1993 at that profession. Finally, he admittedly transferred title to his home and vehicles from joint ownership to single ownership by Patricia Vetrano in an attempt to place these assets beyond respondent's reach should the Court determine that she is an innocent spouse under I.R.C. §6013(e) for the years at issue. [Citations omitted.]

Respondent argues that Mrs. Vetrano's conduct exhibits the following badges of fraud:

She was an active participant in her husband's attempts to conceal the correct amount of his 1993 income. She handled all of the BMAP checks, cashed them, and received the proceeds. She endorsed most of these checks, and on some occasions signed her husband's name on them. She dealt in cash to avoid scrutiny of her and her husband's finances. Her actions were designed to cover up the source of his income from his first wife, the divorce court, and not coincidentally, the Internal Revenue Service. Mrs. Vetrano signed a joint tax return containing an amount of income for her husband that she knew had to be false. She also took title to their home and vehicles in an attempt to place them beyond respondent's reach. [Citations omitted.]

In their posttrial brief, petitioners' only mention of the fraud penalty is the following:

The IRS has asserted the civil fraud penalty against Mr. Vetrano and amazingly against Mrs. Vetrano as well. Pursuant to 26 U.S.C. § 7454 and Tax Court Rule 142(b), this shifts the burden of proof to the IRS. Such fraud must be proven by clear and convincing evidence. Smith v. Commissioner, 91 T.C. 1049, 1053 (1988). In unreported income cases the burden is on the IRS to offer a rational basis for the deficiency and if no rational basis exists for the proposed

adjustments the Court can conclude that the deficiency is arbitrary and unreasonable. Portillo v. Commissioner, 932 F.2d 1128, 1132 (5th Cir. 1991); Jackson v. Commissioner, 73 T.C. 394, 396-97, 402 (1979).  Without this presumption of correctness the IRS must do more than submit its belief that Mr. Vetrano had this income.  They did not present any such evidence, in fact they presented evidence that Mr. Vetrano had no such unreported income through the testimony of Mr. Gartland.  A decision in favor of both Mr. and Mrs. Vetrano is warranted under these facts.

We agree with respondent that the underpayment in each of the years in issue is attributable to the fraud of Mr. Vetrano.  Respondent established that the portion of the underpayment in each year attributable to the payments from BMAP is due to fraud.  The record shows that petitioner engaged in an automobile parts business and realized substantial income from selling automobile parts to BMAP in each of those years.  Petitioner took steps to conceal the income that he earned from his automobile parts business from his accountant, from his ex-wife, and from the Internal Revenue Service.  These steps included, among others, failing to maintain or produce books and records regarding his automobile parts business, conducting his business and personal affairs almost entirely in cash, and providing false information to his former spouse and to the court in his divorce action.

As mentioned above, if the Commissioner establishes that any portion of an underpayment is attributable to fraud, then the entire underpayment is treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud. See sec. 6663(b). In this case, petitioners have not established that any portion of the underpayment in each of the years in issue is not attributable to fraud. See id. Specifically, petitioners have not established that the portion of the underpayments relating to the payments from Sing-Sing, Gerre Trans, Richman & Sons, and Camden City Probation is not attributable to fraud.

We also agree with respondent that Mrs. Vetrano played a role in her husband's fraudulent scheme and that some part of the underpayment for 1993 is due to her fraud. See sec. 6663(c). She knew of her husband's activities in connection with his automobile parts business involving BMAP during the years in issue. She was aware of the payments received from BMAP during 1993, and she played an important part in converting the checks received from BMAP to cash. She oversaw payment of the couple's monthly bills and deposited only the amount of cash necessary to pay the couple's monthly bills. Accordingly, we sustain

respondent's determination that petitioner is liable for the fraud penalty with respect to the 1991 and 1992 tax years and that both petitioners are liable for the fraud penalty with respect to 1993.

In light of the fact that the so-called innocent spouse issue remains for decision in this case,

<u>An appropriate order</u>

<u>will be issued</u>.